UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ANA SEGUI,

                              Plaintiff,

          – against –

SOLAR MOSAIC, LLC, *and* MPOWER
ENERGY, LLC *d/b/a MPower Solar, LLC*,

                              Defendants.

**OPINION & ORDER**

24 Civ. 968 (ER)

RAMOS, D.J.:

     Ana Segui brought this action against Solar Mosaic, LLC ("Solar Mosaic") and

MPower Energy, LLC ("MPower") (collectively, "Defendants"), alleging violations of

the Fair Credit Reporting Act, New York General Business Law § 349, and fraudulent

concealment/nondisclosure against both Defendants, a claim of violation of the Truth in

Lending Act against Solar Mosaic only, and a claim of a violation of New York General

Business Law § 770 against MPower only.  Doc. 1.

     Before the Court is MPower's motion to compel arbitration pursuant to 9 U.S.C. §

4.  For the reasons set forth below, the motion is DENIED.

I.     **BACKGROUND**

     A.  **Factual Background[1]**

     *1.  Parties*

     Segui is 81 years old.  Doc. 1 ¶ 13.  She lives in the Bronx, NY, in the house that

she inherited from her parents and which has been in her family for over 60 years.  Doc.

59-4 (Segui Deposition Transcript) at 108, 110.  She testified that she has never taken out

a loan against her family home, nor entered into a home equity line of credit.  *Id.* at 111.

Segui's daughter-in-law, Jacqueline Segui, states in her declaration that Segui "does not

_____

[1] The following facts are primarily drawn from the complaint, deposition transcripts, Segui's and MPower's
briefs, and the declarations in support thereto.  The facts are undisputed unless otherwise indicated.

have a computer, a tablet device, a smart phone, wi-fi, internet, nor any other way to view or complete any electronic documents." Doc. 65-2 ¶ 2. She also provides that Segui "has never had an email account." *See id.* ¶ 10; *id.* at ECF 15. Segui uses a "flip phone" as her mobile device, and she has never had a laptop. Doc. 65-3.

MPower, a New York corporation, is involved in marketing, selling, and installing solar energy systems on residential properties. Doc. 1 ¶¶ 17, 18. Solar Mosaic, a California corporation, offers loans for residential solar panels. *Id.* ¶¶ 14, 15. Solar Mosaic partners with companies like MPower to provide financing for solar products. *Id.* ¶ 19. MPower states that it and Solar Mosaic are not otherwise "related in any way." Doc. 58 at 2 n.2, 5 n.5.

### 2. The March 2023 Visit

On March 22, 2023, Segui was solicited by an MPower salesperson, Klevis Vulaj,[2] at her home in the Bronx. Doc. 1 ¶ 25; *see also* Doc. 65 at 18 n.7.[3] As a sales representative for MPower, Vulaj made hundreds of sales visits for solar panel installations. Doc. 59-5 (Vulaj Deposition Transcript) at 15, 23. Vulaj was compensated with a salary as well as commissions based on the size of each installation that he sold. *Id.* at 24, 25.

As discussed below, Segui claims that, during the March 2023 visit, she signed a blank page on Vulaj's tablet for the sole purpose of granting permission for her roof to be inspected and solar panels to be installed free of charge. MPower, on the other hand, claims that Segui signed three distinct contracts: one with MPower for the installation of solar panels, and two loan agreements with Solar Mosaic for financing the panels. Segui

---

[2] In her responses to Solar Mosaic's interrogatories, Segui stated that another individual named Andre Summers, who she "suspected to be an agent of [D]efendants," was also briefly present during a March 2023 visit, however she "does not believe she spoke to [him] at all." *See* Doc. 65-6 ¶¶ 1, 2. At her deposition, Segui also testified that one of the individuals left partway through the conversation, Doc. 59-4 at 50; the Court presumes this was Summers, given that in her opposition, Segui only discusses Vulaj visiting her home in March 2023. *See* Doc. 65 at 5.

[3] Nothing in the record suggests that Segui affirmatively requested the solicitation, or that she was in the market for solar panels at the time of the visit.

claims she was not provided copies of the alleged agreements until "well after panels were installed." Doc. 65 at 17.

   *a.   The Pitch*

Segui claims that the MPower representatives who visited her home in March 2023 simply offered her free solar panels.[4] She testified at her deposition that the representatives explained to her that putting solar panels on the roof was a good idea, for minimizing electricity costs and for clean air. Doc. 59-4 at 51. When asked whether the individuals were trying to sell her the solar panels, she initially responded: "They tried to convince me to – to do it, to put the panels and . . . that it was a good idea." *Id.* at 54. Asked a second time whether the salespeople were trying to sell her the panels, she responded: "Yes. In a way? Yeah." *Id.* Then, when asked what she meant by "in a way," Segui responded: "Well, because I wasn't sure what was going on . . . So they explained it's a good idea to do it because . . . too much electricity, it's clean air. I don't have to pay anything to them." *Id.* at 54–55. In response to various questions, Segui testified that she did not recall the salespersons talking to her about a loan to help her purchase the solar panels, nor did she otherwise recall any discussion about how the solar panels would be paid for. *Id.* at 55. Indeed, she testified that she was told she would get the solar panels for free, and she understood there were "no strings attached." *Id.* at 56.

Segui also testified that Vulaj showed her a brochure, but no other paper documents, during the visit. *Id.* at 57. She testified that, during the visit, Vulaj was using a tablet device. *Id.* When asked if she was asked to fill out any forms, Segui responded: "They told me to sign it to give them permission to go to the roof, so I signed." *Id.* at 57–58. Segui testified that she was handed the tablet device just once during the visit, in order for her to sign her name. *Id.* at 65. When asked whether there was any text or

---

[4] In her complaint, Segui states that she was told she could get free solar panels as part of a "a government program to help senior citizens save on their electric bills." Doc. 1 ¶ 27. However, in her deposition, Segui did not recall whether Vulaj spoke to her about a government program. *See* Doc. 59-4 at 55.

writing above or below where she signed, Segui responded in the negative.  *Id.* at 69.  The
deposition proceeded as follows:

> Q:  What did – what did it look like where you signed on the tablet?
>
> A:  It was blank – it's blank.  I just signed.  They had no words.  No –
> nothing.  I just signed.
>
> Q:  Was it a completely blank screen?
>
> A:  It was blank.  Yeah.
>
> Q:  Was there a line where you could sign?
>
> A:  I don't remember.  I don't know.  I don't remember.
>
> Q:  Do you remember if it said, you know, sign here?
>
> A:  No.  It didn't say nothing.
>
> Q:  Did you try to scroll up on the tablet to see if there was any text?
>
> A:  No.
>
> Q:  Did you try to scroll down on the tablet to see if there was any text
> below where you would sign?
>
> A:  No.
>
> Q:  And did [Vulaj] tell you what you were signing?
>
> A:  To give them permission to go up to the roof and do their job.

*Id.* at 69–70.  Segui was also asked at her deposition whether she requested to read what
it was that she was signing for, and she responded "I thought I was giving them
permission to go up to the roof.  That's why I signed."  *Id.* at 71.  When asked, thereafter,
whether it was "a document giving them permission to go on the roof," Segui responded,
"No."  *Id.*  Segui testified that Vulaj did not ask her any questions while using the tablet,
that the tablet was at no point given to her to look at, that she did not read anything on it,
and that, other than signing, she did not type, tap, or click anything on the tablet.  *Id.* at
57–58, 63, 72.

During the visit, Vulaj asked Segui for her social security number, date of birth,
and phone number, all of which she provided.  *Id.* at 65–66.  Segui testified that she did
not recall whether this was before or after she signed on the tablet.  *Id.* at 69.  However,
when asked at her deposition if she was told why she needed to provide her social

security number, Segui responded that MPower needed it in order to have permission to go to the roof.  *Id.* at 58.

      *b.  The Email Address and Brochure*

During the visit, Vulaj also asked Segui if she had an email address, and she responded in the negative.  *Id.* at 66–67.  Vulaj then offered to make an email address for her, though he did not explain why it was necessary to do so.  *Id.* at 67.  At Segui's deposition, she testified that she did not remember giving Vulaj permission to make an email address for her or whether he told her what the email address was; she also testified that she did not remember looking at an email account, nor whether Vulaj confirmed he successfully set one up.  *Id.* at 67–68.  During discovery, it was confirmed that an email account for "AnaSegui1943@gmail.com"[5] was opened on March 22, 2023, at 11:37 a.m. EST.  Doc. 65-11 ¶¶ 13, 13(a).  Vulaj handwrote this email address on a brochure which he gave to Segui during the visit.  Doc. 60-6; *see also* Doc. 59-4 at 100–101.  The brochure also had a handwritten arrow pointing from the email address to Vulaj's name and phone number.  Doc. 60-6.  On the brochure were also the handwritten words "Welcome Call,"  with "yes" "no" and "yes" each circled underneath.  *Id.*  An image of this page from the brochure is provided herein:

---

[5] Segui was born in 1943, as she later provided on a telephone call with a Solar Mosaic representative.  *See* Doc. 60-11.



*Id.* When asked at her deposition whether she knew why the "two yeses and a no" were written and circled on the brochure, Segui answered that when she was being questioned during a phone call with Solar Mosaic, Vulaj pointed to "yes" or "no" to indicate which she should say. Doc. 59-4 at 101–102.

  *c.  The "Welcome Call"*

  Indeed, during the March 22, 2023 visit, a recorded phone call was conducted between Segui and a Solar Mosaic representative. *See* Doc. 60-11.[6] In the call, the Solar Mosaic representative asks, "how can I help you today?"; after a six-second pause, Segui responds, "welcome call. A welcome call." *Id.* The representative confirms Segui's "installation address" and name, then proceeds with the following introduction:

> OK, Ana, this call is because we want to welcome you to the Mosaic community as we provide financing for your project. This is one of the final steps in your loan application and the purpose is to go over some key loan terms with you, so you have a full understanding of our loan product.

---

[6] This exhibit corresponds to a recording of the call, which MPower submitted to the Court under seal.

*Id.*; *see also* Doc. 59-3 (partially redacted transcript) at 1.[7]  Segui responds, "alright."

Doc. 60-11.  The representative then verifies Segui's identity.  First, she asks for Segui's

name and date of birth, which Segui readily provides.  *Id.*  The representative then

requests:  "Now the last four numbers of your social and your e-mail address."  *Id.*  Segui

responds with the last four digits of her social security number, then takes a long pause.

Approximately five seconds into the pause, Segui asks in the background, presumably to

Vulaj:  "1943, what's this?"  *Id.*  Another three-to-four seconds later, the representative

on the call repeats:  "your email address?"  *Id.*  Another seven seconds later, Segui states:

"AnaSegui1943@gmail . . . [pause] . . . gmail."  *Id.*  The representative completes the

verification process by asking Segui for her phone number and address.  Then, the

representative asks Segui several leading questions, each of which she answers in the

affirmative, as follows:

> Representative:  OK.  Ana, do you understand that this loan is at an annual
> percentage rate of 4.24?
>
> [Five-second pause]
>
> Segui:  Yes.
>
> Representative:  Do you understand that this loan offers a 12-month
> promotion of deferred interest and no monthly payments?
>
> Segui:  Yes.
>
> Representative:  This means that while you will not have to make any
> payments for the first 12 months, you will be accruing interest at the start
> of your loan.  At the end of the 12-month promotion, you will have to
> make regular monthly payments for 25 years.
>
> Segui:  OK.
>
> Representative:  You can make optional payments during your 12-month
> promotional period to take advantage of lower monthly payments and
> reduce the amount of interest that you accrue.
>
> Segui:  OK . . .

---

[7] The portions of the recorded conversation quoted here, as well as the attributions, were prepared by the
Court.

>    Representative:  As long – OK – as long as you pay off your loan entirely
>    during your promotional period, you will not pay any interest.  Does this
>    make sense?
>
>    Segui:  Yes.
>
>    Representative:  OK and I see you are not currently signed up for
>    automatic payments.  Do you understand how it works?
>
>    Segui:  Yes.

*Id.*  As previously mentioned, Segui testified at her deposition that she responded to the questions on the call based on Vulaj's guidance.  When asked if she knew why "yes" and "no" were circled on the brochure that Vulaj provided her, she responded:  "Because when they . . . was questioning me, he pointed to yes or no.  So I could say yes or no."  Doc. 59-4 at 102.

The recording of the welcome call does not include mention of the word "arbitration" at any point.  Doc. 60-11; Doc. 65 at 11.  Each of Segui and Vulaj testified at their respective depositions that they do not know what the word "arbitration" means.  Doc. 59-4 at 114; Doc. 59-5 at 42.  MPower's corporate designee, Edward Westwood, was also asked in his deposition whether he knew what the word "arbitration" means; he responded:  "I think I have a general idea.  It's basically, before going to court, gives us the opportunity to resolve out of court or with a liaison or a court representative."  Doc. 65-8 at 94.  The deposition of MPower designee Westwood continued as follows:  "Q: Do M[P]ower solar salesmen mention that word arbitration to the consumer?;  A:  No, we don't talk about that at the point of sale.;  Q:  Do you know if the term arbitration is discussed in any, quote, welcome call?;  A:  No."  *Id.*

At her deposition, Segui was asked several questions about her impression of Vulaj, and about the information she received during his March 2023 visit to her home.  She testified that Vulaj was friendly and that she did not have any reason to distrust him, or to think that he was lying to her.  Doc. 59-4 at 111–112.  When asked whether Vulaj mentioned "that there was any loan associated with the solar panels at all," Segui

responded in the negative. *Id.* at 112. She also responded in the negative when asked if Vulaj said he would "put [her] in a loan with a total of payments of $68,000," that the loan would have to be paid over the course of 25 years, and that the monthly payments would be $229. *Id.* Segui's lawyer then asked her what she would have done had Vulaj told her any of those things, and she responded, "I would have said no." *Id.* When asked why, Segui responded: "Because that's too much . . . I never take a loan like that. No." *Id.* Segui also testified that she was on a "fixed budget." *Id.* at 113. When asked whether Vulaj told her that: he was going to put her in yet a second loan for which she would have to pay a total of $105,000 over 25 years, and her monthly payments would be $351, Segui again answered each question in the negative, adding, "Couldn't afford it. No." *Id.*

     *d. The Subject Agreements*

MPower states that its representative—presumably Vulaj—"prepared a written contract" for Segui "that provided for a solar system including nine (9) solar panels at a 'Gross price of system' of $62,215.91." Doc. 58 at 2; *see* Doc. 59-2 (the "MPower Contract"). As submitted on the record, the MPower Contract contains a title page, seven informational pages explaining, for example, the "[b]enefits of solar" and the projected savings for the project, two pages for signatures, a page describing a "3 day right to rescission" of the contract, nine pages with terms and conditions, and a page itemizing the price and payment information for the solar project. *See generally* Doc. 59-2. Page 1 contains the title—"Proposal for a 3.285 kW solar project"—Segui's and Vulaj's names, and the phrase "Generated Date: March 20th, 2024." *Id.* at ECF 2. Page 9, the first signature page, contains a large grey box reflecting a signature for "Ana Segui,"[8] and the

---

[8] The signature page on the MPower Contract does not indicate the signature was inserted with DocuSign, unlike the signatures reflected on the two loan agreements discussed below. *See* Doc. 69 at 6, 6 n.2. MPower claims that the MPower Contract contains Segui's "physical signature, which she affixed with her finger on the salesman's tablet device." *Id.* at 6. Meanwhile, Segui argues: "At no point has MPower offered into evidence any DocuSign or other audit trail explaining how and under what circumstances this document was allegedly signed, or if it too was emailed to the email address Vulaj created." Doc. 65 at 9. This email address is discussed below.

signature date April 21, 2023.[9]  *Id.* at ECF 10.  Above the grey box, the page states:

"Signature" and "I hereby agree to move forward with the solar project as described

above and agree to the Terms and Conditions below of the contract provided by the

installer M[P]ower Solar joined to this proposal."  *Id.*  The terms and conditions include

an arbitration provision which states, in part:

> **<u>Dispute Resolution; Arbitration; Class Action Waiver</u>**.  In the unlikely
> event the parties are unable to resolve by the informal resolution process of
> the Section entitled Mandatory Informal Dispute Resolution, a Claim
> arising out of or relating in any way to this Agreement, or to any acts or
> omissions of other users for which you may contend we are liable
> ("Claim"), within 60 days of the receipt of the applicable Notice from you
> you and M[P]ower agree that the Claim shall be finally, and exclusively,
> resolved and settled by binding arbitration before an arbitrator from the
> American Arbitration Association ("AAA") in New York City, from which
> there shall be no appeal.  The arbitration shall be held before one arbitrator
> selected pursuant to AAA rules.  The arbitrator shall apply the substantive
> law of the state of New York, exclusive of its choice of law principles and
> any international convention on contracts, except that the interpretation and
> enforcement of this arbitration provision shall be governed by the U.S.
> Federal Arbitration Act.
>
> [ . . . ]
>
> THIS AGREEMENT PROVIDES THAT ALL DISPUTES BETWEEN
> YOU AND MPOWER WILL BE RESOLVED BY BINDING
> ARBITRATION.  YOU THUS GIVE UP YOUR RIGHT TO GO TO
> COURT TO ASSERT OR DEFEND YOUR RIGHTS.  YOU ALSO GIVE
> UP YOUR RIGHT TO PARTICIPATE IN OR BRING CLASS ACTIONS.
> YOU ACKNOWLEDGE AND AGREE THAT YOU AND WE ARE
> EACH WAIVING THE RIGHT TO PARTICIPATE AS A PLAINTIFF OR
> CLASS MEMBER IN ANY PURPORTED CLASS ACTION OR
> REPRESENTATIVE PROCEEDING.

*Id.* at ECF 19.  Finally, the page with pricing information includes, in part, a "loan

option" for $62,215.91, and the "gross price of [the] system."  *Id.* at ECF 22.

　　　At her deposition, Segui was shown the MPower Contract, and she testified that

she did not recognize it, did not recognize the signature on page 9, did not recall making

---

[9] MPower claims that, although Segui only states she was solicited by a salesperson in March 2023,
"M[P]ower's sales agent visited [her] residence on multiple occasions[.]"  Doc. 58 at 2 n.3.

that signature, and did not remember meeting with anyone from MPower on April 21, 2023.  Doc. 59-4 at 98–100.  In fact, Segui testified that she only met with Vulaj one time, *id.* at 108; Vulaj, on the other hand, testified that they met "at least two, three times." Doc. 59-5 at 101.

MPower claims that Segui also "agreed to finance her purchase with Solar Mosaic" through two loan agreements, and that, to that end, she "provided her identification and financial details to M[P]ower's sales agent."  Doc. 58 at 4.  The two loan agreements, submitted into the record by Solar Mosaic along with its motion to compel arbitration,[10] are:  a 30-page agreement which reflects a DocuSign signature for "Ana Segui" as "borrower," inserted on March 22, 2023, and a second 30-page agreement which reflects a DocuSign signature for "Ana Segui" as "borrower," inserted on April 21, 2023.  Docs. 60-8 and 60-13, respectively.  The Court notes that the signatures on these two loan agreements appear identical to one another, but distinct from the signature on the MPower Contract—which, unlike in the loan agreements, does not indicate that it was inserted via DocuSign.  *Compare* Docs. 60-8 at ECF 31 and 60-13 at ECF 31 *with* Doc. 59-2 at ECF 10.  Each loan agreement has a corresponding DocuSign "certificate of completion," which, in part, contains a timestamp indicating the dates and precise times at which the agreements were sent, viewed, and signed.  Docs. 60-10, 60-15.  The March 22 loan agreement was sent, viewed, and signed through DocuSign on March 22, 2023 over a period of 47 seconds—at 8:45:08 a.m., 8:45:23 a.m., and 8:45:55 a.m. Pacific Time, respectively.  Doc. 60-10.  The April 21 loan agreement was sent, viewed, and signed through DocuSign on April 21, 2023 over a period of 17 seconds—at 9:41:50 a.m., 9:42:00 a.m., and 9:42:07 a.m. Pacific Time, respectively.  Doc. 16-15.[11]

---

[10] Although Solar Mosaic's motion is not at issue here because this action is stayed as to them, the Court considers these exhibits because they are relevant to MPower's instant motion.

[11] MPower's corporate designee, Westwood, was asked at his deposition to review the March 22 loan agreement in order to be questioned about it.  Doc. 65-8 at 89.  Westwood took approximately 12 minutes

Vulaj testified that not all clients view terms and conditions before signing, stating: "I give everyone the opportunity to look over their contract terms and conditions and -- but again, that's very situational. Some people, they . . . read over it . . . Some people they . . . choose not to. They choose to just sign right then and there. . . . They choose to do it later but sign while I am there." Doc. 59-5 at 92–93. In an expert declaration submitted in support of Segui's opposition, Daniel Thimot—an information technology expert—states that, based on his analysis of IP addresses, the device used to view and sign both loan agreements was a "mobile device such as a phone or tablet," and it was connected to "a network address publicly belonging to the T-Mobile Network" when the agreements were signed.[12] Doc. 65-11 ¶ 16(a).

At her deposition, Segui was shown the March 22 and April 21 loan agreements, including their respective signature pages. *See* Doc. 59-4 at 72–75, 93–94. When shown the March 22 loan agreement, Segui testified that she did not sign it, that the signature on it did not look like the one she provided when signing Vulaj's device during his sales visit, and that she had no recollection of being told about "DocuSign" during the visit. Doc. 59-4 at 72–75. As to the April 21 agreement, she again testified that she did not recognize that document nor her purported signature. *Id.* at 94.

At his deposition, Vulaj was shown the March 22 loan agreement and asked how a signature could end up on that document if Segui testified that it was not hers. Doc. 59-5 at 97. Vulaj answered: "Sometimes – now that you remind me, sometimes it autopopulates, so the customer – all you have to do is click on the box where it says 'Sign' and it autopopulates her signature. So if it's not her signature, it's most likely not

_____

to skim the contract, and he noted that this gave him a "general idea" of the information in the contract. *Id.* at 90–91.

[12] As noted above, on the date the loan agreements were signed, Segui did not have Wi-Fi or internet access.

her signature. It's DocuSign's way of automating that signature." *Id.* Vulaj also testified
that a valid email address is required for DocuSign to be used. *Id.* at 100.

Segui testified that, at some point after March 22, 2023, possibly two to three
weeks later, the solar panels were installed on her home. Doc. 59-4 at 88, 89. She
testified that, when she answered the door, the men told her that they were there to install
the panels; however, they did not discuss anything else, did not ask her any questions,
and did not show her any tablet or documents. *Id.* at 91–92.

  *3. Segui Discovers and Attempts to Cancel the Loan*

In June 2023, Segui received a billing statement for "Loan Number 373272,"
from Solar Mosaic, providing that she owed a payment on an "Original Loan Amount of
$62,216.00." Doc. 65 at 3; *see* Doc. 65-4 (billing statement dated June 15, 2023). Segui
testified that she had not applied for this loan. Doc. 59-4 at 96. In her opposition, she
states she was "[t]otally taken aback" by this billing statement, and so she asked her
children to help her understand it. Doc. 65 at 3. She testified that, after discussing this
statement with her daughter, Anna Acosta, Acosta helped her write a letter asserting that
the contract involved a "misrepresentation of [a] project of 62,216.00 dollars." Doc. 59-4
at 86, 96; *see also id.* at 26.

Indeed, the record in this case contains a letter, addressed from Segui to MPower
and Solar Mosaic, demanding "a complete termination & cancellation" of the contract
corresponding to Loan 373272 on the basis of fraud, and stating that the "execution of
th[e] contract . . . includes [the] misrepresentation of [a] project of 62,216.00 dollars[.]"
Doc. 65-3. In her opposition, Segui refers to this letter as a "notice of cancellation," and
she states that her children sent it to Defendants in July 2023. Doc. 65 at 3. Segui's
notice of cancellation also states that Vulaj "made up" an email that Segui does not have
access to, that Segui does not have Wi-Fi and has never had a laptop, and that she only
has a flip phone. Doc. 65-3. It states that Vulaj left Segui with nothing but a brochure,
and that when Segui got billed for $62,216 she was "totally taken [a]back" because she

"did not know about a loan" and only learned about it upon receiving the billing statement. *Id.* Segui also states in the notice of cancellation she would never have taken a loan at her age of 80, and that the situation has caused her stress. *Id.*

Segui states that the evidence demonstrates that a version of the MPower Contract was first sent to her and her daughters on July 19, 2023. Doc. 65 at 10 (citing Doc. 65-13, an email from MPower to Mosaic dated July 20, 2023, stating that a "physical copy of [the] proposal" was mailed to Segui and her daughters the day before).

### 4. *Lezell's Visit*

Sometime after Segui sent her notice of cancellation to MPower, an MPower representative named Jacob Lezell and another individual visited Segui. MPower submitted a recording of their seventeen-minute conversation on the record, *see* Doc. 63 ¶ 2.[13] Segui states in her opposition that she was never informed that she was being recorded, nor did anyone ask for her permission to record the conversation. Doc. 65 at 13.

In the recording, after Lezell introduces himself, he says, "we need to talk," and Segui responds "No." Doc. 63, Exhibit J. Lezell states, "we want to talk to you and see how we can help." *Id.* Segui responds, "you cannot help. My lawyer will talk to you. This is ridiculous, what they did." *Id.* Lezell asks what happened and Segui states that the individuals who visited her home "took all [her] information" then they billed her for a loan for "$23 thousand" which she "didn't sign for." *Id.* Lezell asks: "What happened when they came to your house? What was the whole process like?" *Id.* Segui explains, in part, that "they came in and took [her] information, they said it would be free," they "took [her] social security," and she "had to sign . . . so they had permission to go up and do the stuff . . ." *Id.* Lezell asks her if she completed a call with a finance company. *Id.* Segui responds "no I never . . . my son-in-law called to tell them 'this is fraud, she didn't

---

[13] MPower did not submit a transcript of the recording. The portions of the recorded conversation quoted here, as well as the attributions, were prepared by the Court.

sign for a loan.'" *Id.* Lezell explains to Segui the "typical process" that MPower engages in with customers, including that, after a sale, there is a verification call to go over the loan amount, and "you have to verbally say 'yes' because in court-- you can't just say it, you know in court . . . want to hear the customer say 'yes.'" *Id.* Segui states this did not happen, and Lezell responds that he understands there is a recording of it which will be provided to her. *Id.* Segui reiterates that she provided her signature only so that panels could be installed on her home. *Id.*

As the rest of the conversation unfolds, Lezell states numerous times that he would like to find a solution. Segui, in turn, repeats several times that she needs to speak with her son-in-law or her lawyer. For example, Lezell asks Segui if she wants to "go this route with lawyers and courts," engaging in a fight "with the bank," or whether she wants to find a solution. *Id.* Segui responds, "I just don't want to pay . . . that twenty-some-- sixty-two-something thousand dollars." *Id.* Lezell responds: "so you want to find a solution then? Can we work together maybe here?" *Id.* Segui states she has to talk to her son-in-law because he is the one helping her out. *Id.* Lezell proposes: "so the solution I can come up with, and you can speak with him if you'd like, is to make it where your payments for your solar system are going to be lower than your payments to the utility." *Id.* Again, Segui responds: "let's see what my son-in-law says, and my lawyer." *Id.* Segui adds that she cannot sleep and is concerned about affording her medication. *Id.* Lezell reiterates, "let's find a solution." *Id.* At one point, Segui states that all she got was a "booklet," and Lezell asks: "How many times did you sign paperwork?" *Id.* Segui responds, "there was no paperwork." *Id.* Lezell states: "let's think of something here . . . We can go that route; I really don't want to, because you're our customer and I want you to be happy. That's what matters to me. I don't need you to go out there and start fighting in court." *Id.* Segui responds, "Let's see what my son-in-law says." *Id.* Lezell asks if she wants to call him in that moment, and she says he is at

work; however, Segui agrees to provide her son-in-law with Lezell's phone number.  *Id.*

Lezell makes two final propositions as the conversation winds down:

> Let's find a solution.  I'm not looking to—I want when I leave here, that
> you're happy.  And if it means us taking a loss, it means us paying you some
> extra money, I'll do that.
>
> [ . . . ]
>
> Let your son-in-law know that I stopped by, and I want to speak to him
> tomorrow . . .  Explain to him that I'm not looking to fight, I'm not looking
> to argue . . . Explain to him, Ms. Segui, that I want to find a solution so that
> you're happy.  If it means writing a check, I'll do that.  Let's just get this
> over with and move on with our lives.

*Id.*

### 5.  *Segui Attempts to Access the Email*

Segui's daughter-in-law, Jacqueline Segui, attests that in September 2023, she

became aware of the problem Segui was having related to the installation of solar panels

on her home.  Doc. 65-2 ¶ 3.  Segui asked Jacqueline to help log in to an email account

that "was apparently set up for her by the salesman for the solar companies, Klevis

Vulaj."  *Id.*  Jacqueline states that she attempted to log into the email account

AnaSegui1943@gmail.com, however Segui did not have a password to access it.  *Id.* ¶ 4.

Jacqueline states she clicked "forgot password," which prompted the system to send a

message to a phone number ending in "35"—which was the number handwritten beside

Vulaj's name on the brochure, and which Vulaj confirmed in his deposition is his mobile

number.  *Id.* ¶¶ 5, 6; Doc. 59-5 at 59.  Jacqueline states that she and Segui were unable to

reset the password for the email account, and that to her knowledge, Segui was never able

to log into it.  *Id.* ¶¶ 7, 8.  She attests that Segui "does not have access to any computers

or even [Wi-Fi] in her home," and that she has never had an email account.  *Id.* ¶¶ 10, 11;

*id.* at 15.

In his expert declaration, Thimot states that he—and an IT witness for

Defendants—inspected the contents of the AnaSegui1943@gmail.com account.  Doc. 65-

11 ¶ 9.  Thimot states that he observed that "[o]nly email messages related to a solar

purchase and installation are in the [email] account" and "[t]here are no personal email messages, promotional emails, or other types of email messages unrelated to the solar purchase." Doc. 65-11 ¶¶ 12, 13(b)–(c). In his deposition, Vulaj testified that the only way for Segui to get a copy of the applicable agreements was through email. Doc. 59-5 at 87–90.

   *6. Segui Requests the Loan Agreements*

   Segui states that, when she filed the instant complaint on February 8, 2024, she still did not have a copy of any loan contracts with Solar Mosaic. Doc. 65 at 4. She states that, in April 2024, Solar Mosaic advised her counsel "that it intended to move to compel arbitration on the basis of an arbitration agreement in a loan contract," which prompted Segui to request the contracts. *Id.* Indeed, in an email to Solar Mosaic's counsel, dated April 10, 2024, counsel for Segui wrote:

> I know Mosaic wants to compel arbitration, however my clients still do not even have a copy of the solar contracts at issue in this case, including any that bear an arb clause. As discussed in our call, the email address was apparently created by and controlled by the salesman Klevis, only Klevis has the password, and my clients have not been able to reset the email address because the phone number to do so is Klevis' number. Can you please send those contract docs along to me so we can review our options?

Doc. 65-7 at 1. Segui states that, that same day, Solar Mosaic's counsel "provided a shared file link . . . containing a 'Loan Agreement' purportedly dated April 21, 2023 along with a DocuSign Certificate of Completion [also dated] April 21, 2023," and a recording of a phone call labeled "WC 03222023." Doc 65 at 4.[14] She states that prior to that point, "neither [she] nor anyone helping her had seen any loan agreement from the Defendants." *Id.*

---

[14] Segui does not state whether she was also provided the March 22 loan agreement or the MPower Contract at that time. As previously discussed, Segui provides an email from opposing counsel which indicates that on July 19, 2023, she was sent the MPower Contract.

**B.  Procedural History**

Segui filed the instant complaint on February 8, 2024.  Doc. 1.  She asserts

violations of the Fair Credit Reporting Act, New York General Business Law § 349, and

fraudulent concealment/nondisclosure against both Defendants, a violation of the Truth in

Lending Act against Solar Mosaic only, and a violation of New York General Business

Law § 770 against MPower only.  *Id.*[15]

On May 17 and 22, 2024, Solar Mosaic and MPower respectively requested a pre-

motion conference seeking leave to file motions to compel arbitration.  Docs. 28 and 30.

On June 12, 2024, the Court held a pre-motion conference, at which it ordered the parties

to engage in discovery limited to the issue of contract formation, to be completed by

August 14, 2024.  *See* Min. Entry dated June 12, 2024.  The Court also granted the

Defendants leave to file motions to compel arbitration, and it set a briefing schedule to

follow the completion of the limited discovery.  *Id.*

Segui was deposed on September 18, 2024.  Doc. 59-4.  MPower was deposed,

through corporate designee Edward R. Westwood, on September 24, 2024.  Doc. 65-8.

Vulaj was deposed on September 26, 2024.  Doc. 59-5.  Solar Mosaic was deposed,

through corporate designee Devon Treece, on October 18, 2024.  Doc. 65-10.

On November 21, 2024, MPower and Solar Mosaic filed their respective motions

to compel arbitration.  Docs. 57 and 60.  On June 9, 2025, Solar Mosaic filed a suggestion

of bankruptcy as to itself, and a corresponding notice of automatic stay of the instant civil

case.  Doc. 72.  On June 12, 2025, MPower filed a letter motion requesting that the entire

matter be stayed, that is, that the stay extend to it as well.  Doc. 73.  That same day, Segui

---

[15] Segui advises that there have been multiple prior allegations of fraud against Solar Mosaic, and that Solar Mosaic has been informed of claims similar to those she alleges here since at least 2016, as evidenced by internal emails stating, for example:  "salesperson used email account to access/sign credit application" and "Salesperson impersonated the customer in some manner or forged/falsified customer signatures."  Doc. 65 at 8; *see generally* Doc. 65-12 (emails).  Segui also points to a prior federal case, *Brown v. Solar Mosaic, et al.*, 18 Civ. 2838 (SCB), 2020 WL 1332010, at *1 (M.D. Fla. Mar. 23, 2020), which stemmed from plaintiffs' claims that salesmen of a solar panel company "came to their houses and completed [Solar] Mosaic's online credit application in [p]laintiffs' names without [their] knowledge or consent."

filed a letter in opposition, arguing that the stay should not be applied to MPower as a non-debtor in Solar Mosaic's bankruptcy. Doc. 74. On June 27, 2025, the Court heard argument on MPower's request, and ruled that the automatic stay would not extend to it. *See* Min. Entry dated June 27, 2025.

## II.    LEGAL STANDARDS

Pursuant to the Federal Arbitration Act ("FAA"), a written agreement to arbitrate disputes is "valid, irrevocable, and enforceable." 9 U.S.C. § 2. This reflects "a liberal federal policy favoring arbitration agreements," *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 346 (2011) (quoting *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 24 (1983)), and places arbitration agreements on "the same footing as other contracts," *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 118 (2d Cir. 2012) (quoting *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 511 (1974)). But parties are not required to arbitrate unless they agreed to do so. *Schnabel*, 697 F.3d at 118 (citation omitted). Thus, before an agreement to arbitrate can be enforced, the court must first determine whether an agreement to arbitrate exists. *Id.* This question is governed by contract law. *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 288 (2d Cir. 2019).

To form a contract, there must be a mutual manifestation of assent with respect to all material terms. *Id.* at 289. "Arbitration under the Act is a matter of consent, not coercion." *Opals on Ice Lingerie v. Bodylines Inc.*, 320 F.3d 362, 369 (2d Cir. 2003) (quoting *Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior University*, 489 U.S. 468, 479 (1989)). Thus, though the presumption in favor of arbitration is strong, the law still requires that parties actually agree to arbitration before it will order them to arbitrate a dispute. *Opals on Ice Lingerie*, 320 F.3d at 369. For contracts formed online, "[c]ourts have ruled that, where there is no evidence that an internet or app user had actual knowledge of the contractual terms, the user will still be bound if (1) a reasonably prudent user would be on inquiry notice of the terms, and (2) the user unambiguously manifests assent through . . . conduct that a reasonable person

19

would understand to constitute assent." *Edmundson v. Klarna, Inc.*, 85 F.4th 695, 703 (2d Cir. 2023) (internal quotation marks and citations omitted). "Like other contracts, arbitration agreements 'may be invalidated by generally applicable contract defenses, such as fraud, duress, or unconscionability.'" *Simmons v. SUNco Capital, LLC*, No. 24 Civ. 7129 (BMC), 2025 WL 711724, at *3 (E.D.N.Y. Mar. 5, 2025) (internal quotation marks omitted) (quoting *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 68 (2010)).

In the context of motions to compel arbitration, allegations related to the question of whether the parties formed a valid arbitration agreement are evaluated to determine whether they raise a genuine issue of material fact. *Schnabel*, 697 F.3d at 113; *see also Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003) ("In the context of motions to compel arbitration brought under the [FAA], the court applies a standard similar to that applicable for a motion for summary judgment. If there is an issue of fact as to the making of the agreement for arbitration, then a trial is necessary." (internal citations omitted)). On a motion for summary judgment, the court considers "all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . affidavits," and draws "all reasonable inferences in favor of the non-moving party." *Meyer v. Uber Technologies, Inc.*, 868 F.3d 66, 74 (2d Cir. 2017) (internal quotation marks and citations omitted).

The party seeking to compel arbitration bears an initial burden of demonstrating that an agreement to arbitrate was made. *See Zachman v. Hudson Valley Federal Credit Union*, 49 F.4th 95, 101–102 (2d Cir. 2022) (citation omitted). Once the existence of an agreement to arbitrate is established, the burden shifts to the party seeking to avoid arbitration to "show[ ] the agreement to be inapplicable or invalid." *Id.* at 102 (citation omitted); *see also Doctor's Associates, Inc. v. Alemayehu*, 934 F.3d 245, 251 (2d Cir. 2019) ("An agreement that has not been properly formed is not merely an unenforceable contract; it is not a contract at all.").

If the Court concludes that the parties agreed to arbitrate, "it should then consider whether the dispute falls within the scope of the arbitration agreement." *Uber Technologies, Inc.*, 868 F.3d at 74 (quoting *Specht v. Netscape Communications Corp.*, 306 F.3d 17, 26 (2d Cir. 2002)). If the dispute falls within the scope of the arbitration agreement, the "role of the court ends and the matter is one for arbitration." *Unique Woodworking, Inc. v. N.Y.C. District Council of Carpenters' Pension Fund*, No. 7 Civ. 1951 (WCC), 2007 WL 4267632, at \*4 (S.D.N.Y. Nov. 30, 2007).

## III.    DISCUSSION

Segui opposes MPower's motion "solely on the basis of contract formation." Doc. 65 at 13 n.6.[16] In short, Segui argues that an agreement to arbitrate was never formed because she did not sign the MPower Contract and instead, Defendants procured the purported agreement through fraud.

MPower argues that the "Ana Segui" signature on the MPower Contract "establishes as a matter of law that [Segui] signed the Contract and agreed to go forward with the solar project and the Terms and Conditions joined to the Contract." Doc. 58 at 11; *see also* Doc. 69 at 6 (citing *Fenton v. Criterion Worldwide*, No. 18 Civ. 10224 (ER), 2020 WL 1489795, at \*5 (S.D.N.Y. Mar. 27, 2020) for the proposition that "[u]nder New York law, a person 'who signs or accepts a written contract is conclusively presumed to know its contents and assent to them.'" (quoting *Gold v. Deutsche Aktiengesellschaft*, 365 F.3d 144, 149 (2d Cir. 2004))). It argues that "[w]hether [Segui] chose not to read the Contract or cannot recall reading it, the outcome is the same: by virtue of executing the Contract, [Segui] was placed on inquiry notice of its terms, and she is now bound by those terms." Doc. 58 at 14.

---

[16] Segui does not dispute MPower's contentions that the contract at issue contains an arbitration clause that is valid under the FAA and New York law, that that arbitration provision would apply to the core dispute in this case, or that New York law governs the instant contract dispute based on a choice-of-law clause.

However, as an initial matter, the Court finds a genuine dispute as to whether Segui in fact signed the contract. When she was shown the MPower Contract at her deposition, Segui testified that she did not recognize the signature on it, did not recall making that signature, and did not remember meeting with anyone from MPower on April 21, 2023—the date reflected on the signature page.[17] Doc. 59-4 at 99–100. She testified that the only signature she ever provided was on a blank page on Vulaj's tablet, and that it was only to "give them permission to go up to the roof and do their job." *Id.* at 69–70. Therefore, a reasonable jury could credit Segui's testimony and conclude that she did not sign the MPower Contract itself, but rather Vulaj, or someone else, copied and pasted the signature that she provided on what she recalled being a blank screen onto the contract, rendering it "a forgery, not a genuine signature." *Opals on Ice Lingerie*, 320 F.3d at 370 (finding a contract was void and unenforceable because the experts agreed the plaintiff's signature was "cut and pasted" into it). If the signature was forged, then the MPower Contract is void *ab initio*. *See id.* at 370 ("Under [New York] State law and general contract law, a forged signature renders a contract void *ab initio*. Because there can be no meeting of the minds of the parties when a forgery has been perpetrated, no contract existed in the case at hand." (quoting *Orlosky v. Empire Security Systems*, 657 N.Y.S.2d 840, 842 (N.Y. App. Div. 1997)).

Alternatively, a reasonable jury could find that MPower procured the MPower Contract through fraud in the execution, which would also render it void *ab initio*. "Fraud in the execution" occurs when there is "a misrepresentation as to 'the very character of the proposed contract itself.'" *Delgado v. Ocwen Loan Servicing, LLC*, No. 13 Civ. 4427 (NGG) (ST), 2016 WL 4617159, at *12 (E.D.N.Y. Sept. 2, 2016) (quoting *Revak v. SEC Realty Corp.*, 18 F.3d 81, 91 (2d Cir. 1994)); *see also Hetchop v. Woodlawn at Grassmere, Inc.*, 116 F.3d 28, 31–32 (2d Cir. 1997) ("Fraud in the execution occurs

---

[17] MPower inaccurately states that Segui's "denials of signing relate solely to the Solar Mosaic Loan Agreements." Doc. 69 at 6.

where there is a 'misrepresentation as to the character or essential terms of a proposed contract,' and a party signs without knowing or having a 'reasonable opportunity to know of its character or essential terms.'" (quoting Restatement (Second) of Contracts § 163)). "In order to prevail on such a defense, a party must show excusable ignorance of the contents of the writing signed." *Id.* at 32 (internal quotation marks and citation omitted).

Here, Segui provides sufficient evidence that she did not know or have a reasonable opportunity to know the "true nature or content[]" of what she purportedly signed. *Simmons*, 2025 WL 711724, at *4 (quoting *Langley v. Federal Deposit Insurance Corp.*, 484 U.S. 86, 93 (1987)); *id.* at *4 (denying a pre-discovery motion to compel arbitration, on grounds that there were "questions of material fact as to whether plaintiff actually signed the loan agreement [containing an arbitration clause] and whether she knew the nature of the document she was signing"). Segui consistently and repeatedly claims that she was only offered, and only provided her signature for, free solar panels— not an installation agreement with an arbitration clause or two 25-year loan contracts totaling $ 173,000 in indebtedness.[18] *See Droney v. Vivint Solar*, No. 18 Civ. 849 (RBK) (KMW), 2018 WL 6191887, at *4 (D.N.J. Nov. 28, 2018) (finding the amended complaint alleged fraud in the execution where the plaintiff claimed she signed a blank electronic iPad to permit the defendant's solar panels salesman to enter her home, however the twenty-three page agreement at issue "included a waiver of the [her] right to a jury trial" and was therefore "radically different from what [she] was led to believe [she] was signing." (citation omitted)).

---

[18] MPower also argues for the first time on reply that Segui's "claims are barred by the parol evidence rule, which precludes reliance on prior or contemporaneous representations that conflict with the terms of the contract." Doc. 69 at 4. MPower argues that the parol evidence rule "is applicable here, where a 'free' solar system certainly conflicts with the pricing set forth in M[P]ower's Contract and the terms of Solar Mosaic's Loan Agreement." *Id.* Putting aside that arguments cannot be raised for the first time on reply, the contradiction that MPower highlights merely reinforces that Segui did not understand she was agreeing to purchase solar panels or to finance them through loans.

Segui's deposition testimony as to these facts is corroborated in every material respect by her conversation with Lezell—which, unbeknownst to her, was being recorded—during which she reiterated that she had been offered free solar panels and provided her signature only to that end, and that she did not sign for any loan. Segui also presents compelling evidence that she was never shown the contracts that Defendants claim she entered into. She testified that she only saw a blank page on the tablet when signing it, with no text above or below it, and that she was at no other point given the tablet to look at. When asked explicitly whether she was asked to fill out any forms, Segui testified—consistently, again: "They told me to sign it to give them permission to go to the roof, so I signed." *Id.* at 57–58. Segui likewise told Lezell that no paperwork was provided to her. Moreover, while Vulaj testified that the only way for Segui to get a copy of the applicable agreements was through email,[19] Segui states—and Jacqueline Segui corroborates in her declaration—that she has never had an email address, and she does not have a laptop, smart phone, Wi-Fi, or "any other way to view or complete any electronic documents." Doc. 65-2 ¶ 2. Segui argues:

> The fact that the fake email address was set up the day of Vulaj's visit and only contained emails related to this transaction is telling, as it demonstrates Ms. Segui never saw the emails sent there which were received and accessed only by the salesman, the hallmark of solar fraud. It is undisputed that the email address Defendants created was wholly in their control and inaccessible to Ms. Segui.

Doc. 65 at 20 (internal citation omitted). The evidence compellingly shows that, even if the agreements were sent to AnaSegui1943@gmail.com,[20] Segui was not able to access

---

[19] Vulaj also testified that not all clients view terms and conditions before signing, stating: "I give everyone the opportunity to look over their contract terms and conditions and -- but again, that's very situational. Some people, they . . . read over it . . . Some people they . . . choose not to. They choose to just sign right then and there. . . . They choose to do it later but sign while I am there." Doc. 59-5 at 92–93.

[20] MPower states that Segui "was provided with a PDF copy of the executed [Segui-MPower] Contract by email," Docs. 58 at 1, 4, nowhere suggesting that said "email" was anything other than the one Vulaj created and which Segui was unable to access. An email enclosing a contract with MPower appears to have been sent to Anasegui1943@gmail.com on March 22, 2023, based on the images of extracted emails that Thimot attaches to his expert declaration. *See* Doc. 65-11 at ECF 17.

that email—even when she attempted, with Jacqueline Segui's assistance, to reset the password in September 2023. Therefore, Segui has raised sufficient evidence that she did not know, and did not have a reasonable opportunity to know, the contents of the MPower Contract or loan agreements. *See de Moura Castro by Hilario v. Loanpal, LLC*, 715 F. Supp. 3d 373, 395, 396 (D. Conn. 2024) (finding "issues of material fact as to whether the parties actually agreed to arbitrate," through solar panel installation and financing contracts, where the plaintiff "testified she neither received any documents" and never gained access to the email address to which they were allegedly sent).

MPower argues that, even if Segui did not have actual notice of the terms and conditions in the MPower Contract, which include the arbitration clause, she was on inquiry notice. "Where an offeree does not have *actual* notice of certain contract terms, he is nevertheless bound by such terms if he is on *inquiry* notice of them and assents to them through conduct that a reasonable person would understand to constitute assent." *Lojewski v. Group Solar United States, LLC*, 22 Civ. 10816 (PAE), 2023 WL 5301423, at *9 (S.D.N.Y. Aug. 17, 2023) (emphasis in original) (quoting *Starke*, 913 F.3d at 289). "In determining whether an offeree is on inquiry notice of contract terms, New York courts look to whether the term was obvious and whether it was called to the offeree's attention," a question that "often turns on whether the contract terms were presented to the offeree in a clear and conspicuous way." *Id.* at *8 (citation omitted). Here, the Court finds a genuine dispute as to whether Segui had inquiry notice of the terms and conditions in the MPower Contract.

MPower argues that, "[g]iven the 'transactional context of the parties' dealings,' to which [Segui] testified, any reasonable person in [her] situation would presume that contracting to install a solar energy system on their home 'would require some terms and conditions.'" Doc. 58 at 14 (quoting *Lojewski*, 2023 WL 5301423, at *9). However, the case that MPower relies on, *Lojewski*, is factually distinguishable from the instant case. In *Lojewski*, it was undisputed that the plaintiff admitted to signing the agreement with an

arbitration clause, and that she did so "after (1) a representative made a proposal to the [plaintiffs] regarding solar panel financing and installation; (2) the [plaintiffs] 'decided to move forward with the purchase and installation'; and (3) a representative later visited [their] home to obtain [one plaintiff's] signature with respect to the financing and installation[.]" *Lojewski*, 2023 WL 5301423, at *9, *10. The Court found that "any reasonable person in [the signatory plaintiff's] situation would presume that this third step of the process 'clearly contemplated some sort of continuing relationship between the putative user and Solar Mosaic, one that would require some terms and conditions.'" *Id.* at *9 (alteration adopted). Therefore, the court concluded: "That no one purportedly explained or showed the contents of the terms and conditions to [plaintiff] does not preclude a finding that she had reasonable notice of the *existence* of those teams [sic] and conditions—and, therefore, the duty to inquire about those terms if she wished." *Id.* (emphasis in original).

In the instant case, by contrast, there is a genuine dispute as to whether Segui was even put on notice as to the *existence* of terms and conditions. Unlike in *Lojewski*, where "[t]he salesperson gave the [plaintiffs] a written proposal" that included information on what they would pay, 2023 WL 5301423, at *2, Segui argues she "was never shown any document nor given the opportunity to read any document," Doc. 65 at 16, and the evidence consistently establishes that she was only told her signature would provide permission for a roof inspection and free installation of the solar panels. *Cf. Lojewski*, 2023 WL 5301423, at *10 (stating the plaintiffs did not "come forward with evidence suggesting that the salesperson hurried, coerced, defrauded, or otherwise misled [the signatory plaintiff] into signing the Agreement so as to render the arbitration provision unenforceable"). MPower argues that Segui was put on notice of the existence of terms and conditions by the language above the signature line in the MPower Contract, which explicitly mentions terms and conditions. *See* Doc. 59-2 at ECF 10. However, as previously discussed, Segui testified that the tablet was completely blank the one time she

signed it, and that there was no text or writing above or below where she signed. Therefore, there is a genuine dispute as to whether Segui ever saw any text on the tablet at all; let alone whether "the contract terms were presented to [her] in a clear and conspicuous way." *Lojewski*, 2023 WL 5301423, at *8.

Moreover, given Segui's apparent minimal engagement with technology, the Court cannot find that "any reasonable person in [her] situation" would presume "that her signature on the iPad 'constitute[d] assent'" to terms and conditions. *Id.* at *9; *cf. Bayron-Paz v. Wells Fargo Bank, N.A.*, No. 22 Civ. 6122 (DLC), 2023 WL 4399041, at *4 (S.D.N.Y. July 7, 2023) (granting motion to compel arbitration and rejecting the plaintiff's forgery defense, because although the plaintiff signed a blank iPad screen for a car purchase without first being given the financing contract, he had initially asked for the documents before nonetheless choosing to sign the blank screen after the salesman told him "not to worry and that the documents would be emailed to him afterwards"), *reconsideration denied*, No. 22 Civ. 6122 (DLC), 2023 WL 4706161, at *4 (S.D.N.Y. July 24, 2023). Therefore, MPower's argument that nothing "prevented" Segui from scrolling through the contract is inapposite. Doc. 69 at 3. A reasonable jury could find that Segui had no basis on which to suspect there was any contract to scroll through, particularly where, as she argues, "[i]t is undisputed that only Vulaj controlled the iPad[.]" Doc. 65 at 2; *see Jones v. Solgen Construction, L.L.C.*, 318 Cal. Rptr. 3d 313, 331 (Cal. Ct. App. 2024) (finding that the 81-year-old plaintiff's purported electronic signature was called into question by: "the timing of the review and signature process in relation to [her] clear lack of technological prowess," as well as the fact that the defendant "never e-mailed the . . . installation contract to [plaintiff] during the signing process [and] [i]nstead, the contract was sent to and signed through an e-mail address that [defendants] controlled.").

That Segui purported to confirm her understanding of the terms of her "loan application" during a "welcome call" does not change the Court's determination.[21]  Docs. 60-11, 59-3.  On the welcome call, Segui has represented that she responded "yes" to several leading questions inquiring whether she understood various terms because she was coached to do so by Vulaj, who pointed to the circled "yes" or "no" that he had written on the brochure he gave her.  Moreover, on the recording of the welcome call, Segui sounds hesitant or confused at times, and her responses often follow long pauses and background chatter in which she appears to consult with Vulaj.  Therefore, the welcome call—during which the word "arbitration" was never uttered—does not establish that Segui was aware of the terms and conditions of the MPower Contract, much less that she understood or assented to an arbitration provision.

Segui's experience is materially similar to that of plaintiffs in analogous cases that have denied motions to compel arbitration.  For example, in *West v. Solar Mosaic LLC*, 105 Cal. App. 5th 985 (2024), a sales representative visited the home of a 90-year old couple with dementia, who lived with their adult daughter, and—according to the representative—offered them a home solar system installation project to be financed through Solar Mosaic.  *Id.* at 987–90.  In that case, Solar Mosaic sent the documents to the daughter's email address, and within 23 seconds, the 33-page loan document package was electronically signed, with one of the 90-year-old parent's electronic signatures appearing in seven places.  *Id.* at 990.  Solar Mosaic also completed a recorded

---

[21] Although MPower initially argues in its motion to compel that "[a]ny disputes concerning arbitrability of the Solar Mosaic Loan Agreement are not relevant to arbitrability of the Contract between [Segui] and M[P]ower," Doc. 58 at 7 n.7, appearing to imply that whether Segui entered the loan agreements is irrelevant to whether she entered the MPower Contract, it argues the following in its reply:  "Mrs. Segui could not plausibly sign a contract with M[P]ower believing that she was being given a solar system installed on her roof to supplant her entire electricity bill free of charge – and during a recorded welcome call minutes later confirm her understanding that the solar system was the subject of a lengthy and costly loan."  Doc. 69 at 2.  In any event, although the MPower Contract is "the focus of the pending motion[]," that agreement is "*embedded in* the [loan agreements], and [MPower] present[s] no evidence that such agreements were separately negotiated, discussed, or accepted by [Segui]."  *de Moura Castro*, 715 F. Supp. 3d at 396.

verification call with that parent, who purported to affirm his understanding of various financing terms. *Id.* at 990–91. Solar Mosaic moved to compel arbitration based on provisions in the electronically signed loan agreement. *Id.* at 992. The court affirmed the lower court's denial of the motion to compel, reasoning in part:

> The evidence strongly suggests [the plaintiff] lacked the technical facility to open his daughter's e-mail on what was presumably her mobile phone, create a digital signature, electronically click through and execute the loan agreement in seven locations, and submit those signatures, all in the space of 23 seconds, and it unquestionably demonstrates the existence of a factual dispute as to whether [the plaintiff] actually executed the electronic signatures on the loan documents.

*Id.* at 993. It also rejected Solar Mosaic's argument that the individual "ratified the agreement through the recorded telephone call in which he responded affirmatively to information regarding the loan," noting:

> Given the content and brevity of the call and the lack of comprehension demonstrated by [plaintiff] during the conversation, [the court] cannot say the recorded telephone call is of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding of ratification [of the loan agreement package].

*Id.* at 995–96.

Similarly, in *de Moura Castro*, a case brought by an 80-year old couple against other defendants in the solar panels business, the defendants sought to enforce arbitration clauses in loan and purchase contracts that the plaintiffs had purportedly signed. 715 F. Supp. 3d at 380. The plaintiffs argued, in part, that they "neither signed nor even saw any contract, let alone an arbitration provision," and the "signatures and initials" appearing on the contracts were "forgeries." *Id.* The court found "ample evidence to create a genuine issue of material fact with respect to formation of the alleged arbitration agreements," in part because the welcome call "fail[ed] to prove that the parties had a meeting of the minds," because: it was "apparent" from the recording of the call that the plaintiff "did not truly understand what was going on and that her 'yes' answers were prompted by [the salesperson]," she "sound[ed] noticeably hesitant and unsure in providing her answers,"

and the call did not mention "arbitration." *Id.* at 388, 393, 395.  Here too, the nature of Segui's verification call—as well as the other circumstances surrounding her purported transactions with Defendants—create a genuine issue of material fact as to whether an agreement to arbitrate was formed.  The Court has reviewed the recorded call and finds that, as in *de Moura Castro*, it does not support a finding that Segui manifested assent to an arbitration agreement with MPower.

Finally, Segui provides sufficient evidence in support of her argument that she did not possess an "intent to sign" the underlying contract, as is required for electronic signatures under New York's Electronic Signatures and Records Act ("ESRA") and the federal E-Sign Act.  N.Y. State Technology Law § 302(3) (defining an electronic signature as "an electronic sound, symbol, or process, attached to or logically associated with an electronic record and executed or adopted by a person with the intent to sign the record"); 15 U.S.C. § 7006(5) (defining an electronic signature as "an electronic sound, symbol, or process, attached to or logically associated with a contract or other record and executed or adopted by a person with the intent to sign the record"); *see, e.g.*, *Pepco Energy Services, Inc. v. Geiringer*, No. 7 Civ. 4809 (WDW), 2010 WL 318284, at *2 (E.D.N.Y. Jan. 21, 2010) (acknowledging federal and state law on e-signatures, and stating, "[t]he parties' intent is crucial, and here, . . . there was not only little or no evidence that [signatory] intended to sign the letter, there was ample evidence that he did not so intend.").[22]  As discussed, Segui raises a genuine dispute as to whether she in fact signed the MPower Contract, or whether someone else may have inserted her signature; and Segui provides evidence that her only intention in providing her signature was to provide permission for MPower to access her roof and install solar panels at no cost.  The Court readily finds that, at minimum, there is a genuine dispute as to whether Segui ever

---

[22] Segui correctly notes that MPower does not address whether the signature on the MPower Contract is indeed Segui's "electronic signature" as defined by applicable federal and state law concerning electronic signatures.  *See* Doc. 65 at 17.

intended sign the MPower Contract.  *See de Moura Castro*, 715 F. Supp. 3d at 396 (considering a Connecticut electronic signature law and finding that the "context and surrounding circumstances" of the electronic signature at issue were "ambiguous at best," because while the plaintiff "may have been willing to enter a contract under which she believed that Connecticut would pay for the solar panels," "it is unclear whether she was willing to enter the [loan] agreement and/or [p]urchase contract, as written.").[23]

## IV.    CONCLUSION

For the reasons set forth above, MPower's motion is DENIED.

The parties are directed to appear for a conference on October 9, 2025, at 10:30 a.m. in Courtroom 619 of the United States Courthouse, 40 Foley Square, New York, NY 10007.

The Clerk of Court is respectfully directed to terminate the motion, Doc. 57.

It is SO ORDERED.

Dated:    September 25, 2025
          New York, New York

_____
          EDGARDO RAMOS, U.S.D.J.

---

[23] Segui additionally argues that the contract and agreements were not "in a form that is capable of being retained and accurately reproduced for later reference by all parties or persons who are entitled to retain the contract or other record," as also required by the E-Sign Act where "a statute, regulation, or other rule of law requires that a contract or other record relating to a transaction in or affecting interstate or foreign commerce be in writing."  Doc. 65 at 19 (quoting 15 U.S.C. § 7001(e)).  Segui argues that, because she has no way to view electronic documents and could not access the email address Vulaj created, she was not capable of retaining or reproducing the records.  Doc. 65 at 20–21.